# No. 21-3098

# In the United States Court of Appeals
# For the Seventh Judicial Circuit

---

ANDREW DUNLEVY,

                Plaintiff-Appellant,

    v.

JAMES O. LANGFELDER, ET AL.,

                Defendants-Appellees.

) Appeal from the United States
) District Court for the Central
) District of Illinois, Springfield
) Division
)
) Case No. 19-cv-3093
)
) Hon. Sue E. Myerscough,
) Judge Presiding

---

# Initial Brief of the Appellant

---

**ORAL ARGUMENT REQUESTED**

**JOHN A. BAKER**
Bar #: 6244334
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone: (217) 522-3445
Facsimile: (217) 522-8234
Email: jab@bbklegal.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 21-3098

Short Caption: Andrew Dunlevy v. James Langfelder et.al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

 Andrew Dunlevy

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 Baker, Baker & Krajewski, LLC

(3)   If the party, amicus or intervenor is a corporation:

i)      Identify all its parent corporations, if any; and

 n/a

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

 n/a

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 n/a

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 n/a

Attorney's Signature: /s/ John A. Baker                    Date:  February 22, 2022

Attorney's Printed Name:   John A. Baker

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑   **No** ☐

Address:   Baker, Baker & Krajewski, LLC

 415 South Seventh Street, Springfield,  Illinois   62701

Phone Number:  (217) 522-3445                    Fax Number:  (217) 522-8234

E-Mail Address: jab@bbklegal.com

rev. 12/19 AK

TABLE OF CONTENTS

TABLE OF AUTHORITIES                                                    3

I.  JURISDICTIONAL STATEMENT                                            5

II. ISSUE PRESENTED FOR REVIEW                                          7

III. STATEMENT OF THE CASE                                             8

    A.    Structure of CWLP                                        8

    B.    The position of meter reader                             10

    C.    Probationary status of City employees                    11

    D.    Ott's Investigation into Dunlevy                         12

    E.    Ott and Yakle's Investigation into Murray                13

    F.    Decisions regarding both Dunlevy and Murray              16

IV. SUMMARY OF ARGUMENT                                                19

V.  ARGUMENT                                                           21

    A.    This Court's review of the district court's order is     21
            *de novo* and summary judgment is only appropriate
            when no jury could reasonably find for the non-moving
            party.

    B.    The sole issue on appeal is whether there was            22
            sufficient evidence at the prima facie case stage from
            which a jury could find that  Dunleavy and Murray
            were similarly situated.

    C.    Dunlevy does not need to demonstrate that he was         25
            a perfect employee in order to be successful in his
            claim.

    D.    Dunlevy has sufficiently established a prima facie       25
            case under *McDonnell Douglas* because a jury could
            reasonably conclude that he and Murray were
            "similarly situated."

**E.**     **The district court improperly turned to the pretext        31
stage by evaluating Langfelder's supposed
justifications.  Given that the City advanced no
pretext argument – and given the district court stated
it was not making a pretext analysis – this was error.**

**VI. Conclusion**                                                          33

**VII. Circuit Rule 31(e) Certification**                                   34

**VIII. Circuit Rule 30(d) Statement**                                      35

**IX.  Compliance with Type Limitations**                                   36

**X.  Certificate of Service**                                              37

# TABLE OF AUTHORITIES

## CASES

*Bellaver v. Quanex Corp.*, 200 F.3d 485, 493 (7th Cir.2000) .......................................25

*Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) ..............................20

*Burks v. Wisconsin Dept. of Transp.,* 464 F.3d 744, 750 (7th Cir. 2006) ..................23

*Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012......................................passim

*Elkhatib v. Dunkin Donuts, Inc.,* 493 F.3d 827, 831 (7th Cir. 2007)..........................22

*Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005)..........................................21

*Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).............................25

*Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 793 (7th Cir.1997) ...................................25

*Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312, 314 (7th Cir. 2011)....................20

*Luster v. Illinois Dept. of Corr.*, 652 F.3d 726, 730 (7th Cir. 2011) ...........................24

*McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S. Ct. 2574, 49 L. Ed. 2d
    493 (1976) .....................................................................................................................27

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668
    (1973)......................................................................................................................passim

*Morris v. BNSF Ry. Co.,* 969 F.3d 753, 761 (7th Cir. 2020) ......................................25

*Naficy v. Illinois Dept. of Human Services*, 697 F.3d 504, 511 (7th Cir. 2012) .........22

*Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dept.,* 510 F.3d 681
    (7th Cir. 2007)   26

*Perez v. Thorntons, Inc.,*  731 F.3d 699, 700 (7th Cir. 2013)................................24, 28

*Pyles v. Fahim*, 771 F.3d 403,408 (7th Cir. 2014) .....................................................20

*Schandelmeier–Bartels v. Chicago Park Dist.,* 634 F.3d 372 (7th Cir. 2011) ............24

*Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640 (7th Cir. 2002)......21

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ..............................................................................................................25

*Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 545 N.E.2d 684 (1989). ..................................................................................................................................23

**STATUTES**

28 U.S.C. § 1291 ...................................................................................................................5

28 U.S.C. § 1331 ...................................................................................................................4

28 U.S.C. § 1367 ...................................................................................................................5

42 U.S.C. § 1983 ............................................................................................................4, 23

42 U.S.C. § 2000e ................................................................................................................4

775 ILCS 5/2-101 .................................................................................................................4

**RULES**

Fed.R.App.P. 4(a)(1)(A) ......................................................................................................5

Fed.R.Civ.P. 56 ....................................................................................................................5

## INITIAL BRIEF OF THE APPELLANT

### I. JURISDICTIONAL STATEMENT

On April 8, 2019, Andrew Dunlevy, filed a complaint in the United States District Court for the Central District of Illinois against the City of Springfield, Illinois (the "City"), its mayor, James O. Langfelder ("Langfelder"), and two other municipal management employees, Doug Brown, and John Davis (Dkt. 1).[1] The lawsuit alleged two separate claims. Dunlevy's first claim was brought against Langfelder, Brown, and Davis under 42 U.S.C. § 1983 and alleged that Dunlevy had been denied his rights under the Equal Protection Clause of the Fourteenth Amendment when he was terminated because of his race. The second claim was brought against the City pursuant to the Illinois Human Rights Act, 775 ILCS 5/2-101, and similarly alleged discrimination based upon race.

On May 20, 2019, after he received a right to sue notice from the United States Equal Employment Opportunity Commission, Dunlevy amended his complaint (Dkt. 11). The amendment added a third claim that again alleged discrimination on the basis of race. The difference was that this claim was brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

Dunlevy's first and third claims were brought under a federal statute and thus the district court had jurisdiction to hear both of those claims under 28 U.S.C. § 1331. His second claim was brought under state law, however, the district court

---

[1] Throughout this brief all references to "Dkt." are to the specific docket entry assigned to the case by the district court. All references to "App." are to the appendix attached to this brief.

had supplemental jurisdiction to hear that claim under 28 U.S.C. § 1367.

On October 31, 2020, the Defendants filed a motion for summary judgment under Fed.R.Civ.P. 56 (Dkt. 23). Dunlevy responded to the motion for summary judgment on November 23, 2020 (Dkt. 24). In his response to the motion for summary judgment, Dunlevy acknowledged that Brown and Davis were entitled to summary judgment (Dkt. 24, p. 22-23). The Defendants replied on December 7, 2020 (Dkt. 25).

On October 29, 2021, the district court entered an opinion granting in full the motion for summary judgment (App. 4-18). On November 3, 2021, the district court entered judgment in favor of the Defendants and against Dunlevy (App. 1). Dunlevy filed a notice of appeal on November 4, 2021 (App. 2).

The judgment entered on November 3, 2021, constitutes a "final decision" pursuant to 28 U.S.C. § 1291. This Court has jurisdiction to entertain this appeal pursuant to Fed.R.App.P. 4(a)(1)(A).

In this appeal Dunlevy is appealing for the grant of summary judgment in favor of the City as to Counts II and III and the grant of summary judgment in favor of Langfelder as to Count I. Given that Dunlevy acknowledged that Brown and Davis were entitled to summary judgment, he is not seeking to reverse the grant of summary judgment in their favor.

## II. Issue Presented for Review

The district court granted summary judgment in favor of all Defendants and against Dunlevy. The question raised in this appeal is:

1.  Based upon the record is there sufficient evidence from which a jury could reasonably conclude – at the prima facie case stage of the *McDonnell Douglas* burden shifting – that Dunlevy was similarly situated to Tour Murray?

### III. STATEMENT OF THE CASE

On September 25, 2017, Langfelder, the City's Mayor, extended a job offer for the position of Utility Water Meter Reader to Dunlevy (Dkt. 23-23). One week earlier, on September 18, 2017, Langfelder had extended an identical job offer for the same position to a different individual, Tour Murray (Dkt. 23-24). The job offers provided for the same rate of pay and explained that the position required a "twelve-month probationary period" (Dkt. 23-23, 23-24). Dunlevy and Murray both accepted the positions and commenced working for the City's public utility at about the same time (Dkt. 23-23, 23-24).

Near the end of their respective twelve-month probationary periods, their supervisors investigated concerns that they had about the two. Ultimately, it was recommended that both employees be terminated before their probationary terms had expired (App. 19-25). Despite the identical recommendations, Dunlevy was terminated and Murray was not. Dunlevy is white and Murray is black (Dkt. 12, Answer ¶ 11-12).

### A.     Structure of CWLP

City Water Light and Power ("CWLP") is the City's publicly owned utility.[2] While the numbers fluctuate, there are approximately 530 employees at CWLP out of a total of approximately 1440 City employees (Dkt. 23-6, Brown dep., p. 6; Dkt. 23-19, p. 8).

In 2018 Doug Brown was CWLP's chief utility engineer (Dkt. 23-6, Brown

---

[2] www.cwlp.com/AboutCWLP.aspx (Last visited February 14, 2022).

dep., p. 5). In that capacity he was effectively the highest-ranking employee at CWLP and he reported directly to Mayor Langfelder (Dkt. 23-6, Brown dep., p. 5-6). 29. Langfelder has served as the Mayor of Springfield, Illinois since May of 2015 (Dkt. 23-7, Langfelder dep., p. 6). As mayor, Langfelder is the ultimate decision maker in the hiring and firing of all City employees (Dkt. 23-7, Langfelder dep., p. 8-9; Dkt. 23-8, Kuizin dep., p. 29).

At the time that Dunlevy and Murray were serving their probationary terms, John Davis was employed by CWLP as it's the manager of its electric division (Dkt. 23-5, Davis dep., p. 6). He had responsibility for overseeing the day-to-day operations of the electric division and reported directly to Brown (Dkt. 23-5, Davis dep., p. 6-7). Despite the fact that Dunlevy and Murray both worked to read water meters, their positions reported up to Davis (Dkt. 23-5, Davis dep., p. 6).

In 2018 Gregory Yakle worked at CWLP as its director of transmission and distribution (Dkt. 23-4, Yakle dep., p. 5). In that position he reported directly to Davis (Dkt. 23-5, Davis dep., p. 7; Dkt. 23-2, Ott dep., p. 8).

Donald Ott, at that time, was employed by CWLP as the Superintendent of Distribution and General Services (Dkt. 23-2, Ott dep., p. 6). In that capacity he had approximately 60 people who reported to him and he was responsible for personnel issues for those individuals (Dkt. 23-2, Ott dep., p. 8). Ott reported directly to Yakle (Dkt. 23-2, Ott dep., p. 8).

John Friedmeyer was CWLP's maintenance supervisor and has responsibility for giving daily work assignments to the streetlight crew, meter readers, and utility

9

locators (Dkt. 23-3, Friedmeyer dep., p. 6; Dkt. 23-2, Ott dep., p. 9-10). In total there are approximately 16 people Friedmeyer supervises (Dkt. 23-3, Friedmeyer dep., p. 7). Friedmeyer reported directly to Ott in 2018 (Dkt. 23-3, Friedmeyer dep., p. 7). During their probationary periods, Friedmeyer supervised both Dunlevy and Murray (Dkt. 23-11; Dkt. 23-15;  Dkt. 23-3, Friedmeyer dep., p. 6). He was responsible for the direct supervision of all water meter readers, including both Murray and Dunlevy.  (Dkt. 23-2, Ott dep., p. 10).

In short, Friedmeyer had direct supervision over both Murray and Dunlevy. Friedmeyer reported to Ott, who in turn reported to Yakle, who in turn reported to Davis, who in turn reported to Brown, who reported to Langfelder. This meant that there were five levels of supervision between Murray and Dunlevy and Langfelder.

**B.    The position of meter reader**

The meter reader position is responsible for going out in the field and collecting daily reads of customer water meters (Dkt. 23-2, Ott dep., p. 11). The water meter readers would be responsible for reading meters for both residential and commercial accounts (Dkt. 23-2, Ott dep., p. 11). Some meters have been converted to be read by a radio frequency but approximately 60% must be read manually each month (Dkt. 23-2, Ott dep., p. 13-14). The readers were given a route and they read and followed the same route each month (Dkt. 23-2, Ott dep., p. 11-12).

Owing to the age of some of the residential customer's homes, some of the water meters that need to be read are located in the basements of customers (Dkt.

23-2, Ott dep., p. 12). This means that meter readers would periodically have to enter the homes of customers (Dkt. 23-2, Ott dep., p. 12).

A water meter reader is given a handheld computer that they use to plug in data – the information from the meters -- that they acquire on their route (Dkt. 23-2, Ott dep., p. 14). When a meter reader reaches a home they read the meter and then plug in the relevant information into their handheld computer (Dkt. 23-2, Ott dep., p. 14-15). Once the information has been inputted the computer records the data and the meter reader moves on to the next location (Dkt. 23-2, Ott dep., p. 16).

There is no handbook or policy manual that is given to meter readers to explain the rules that govern their job responsibilities (Dkt. 23-2, Ott dep., p. 16). Rather, they are provided with on-the-job training (Dkt. 23-2, Ott dep., p. 16). In 2018 there were somewhere between six and eight water meter readers employed by CWLP (Dkt. 23-2, Ott dep., p. 10).

## C.    Probationary status of City employees

Both Dunlevy and Murray, like most City employees, were hired as probationary employees.  Under § 36.11 of the City Code, a probationary employee has no protected interest in his position.  The Code provides:

> Upon original appointment, all classified service employees
> shall serve a 12-month probationary period before attaining
> certified status. Employees who receive a promotion shall serve
> a six-month probationary period. Probationary periods may run
> concurrently. If there is an absence of 30 days or more during
> the probationary period, the probationary period shall be
> extended by the period of absence. Probationary employees may

> be summarily dismissed and are not entitled to the protection afforded to certified employees.[3]

Ott believed that as a probationary employee you needed to be an "exemplary Employee" and, if you weren't, you should be released from employment during the probationary process because it is difficult to fire someone after their probationary term has been completed (Dkt. 23-2, Ott dep., p. 26). It is the period of time when the City can determine whether someone should be given a protected interest in their job (Dkt. 23-2, Ott dep., p. 26). He explained:

> They should be trying to prove that they are a good employee, that they are worth keeping. That's the whole for a probationary employee.

(Dkt. 23-2, Ott dep., p. 34)

**D.     Ott's Investigation into Dunlevy**

Upon receiving a customer complaint, Ott performed an investigation into Dunlevy (App. 19-20; Dkt. 23-2, Ott dep., p. 21). His investigation revealed that at several different locations (7 homes) Dunlevy had inputted inaccurate information into his handheld computer (App. 19-20).

As a result of his investigation, Ott wrote a memo to his supervisors on August 20, 2018, recommending that Dunlevy's employment be terminated before his probationary period came to an end (App. 19-20). After reviewing Ott's memorandum and discussing it amongst themselves, Ott, Yakle, Human Resources

---

[3] This provision of the City of Springfield Code of Ordinances can be found at https://library.municode.com/il/springfield/codes/code_of_ordinances?nodeId=TITIIIAD_CH36EMPO (Last visited February 14, 2022).

Director, Jim Kuizin, Davis, and Brown agreed to recommend to Langfelder that Dunlevy be discharged (Dkt. 23-6, Brown dep., p. 7; Dkt. 23-5, Davis dep., p. 9, 14; App. 19-20).

Dunlevy denies that he was inputting inaccurate information on purpose or that he was not actually reading the meters (Dkt. 23-1, Dunlevy dep., p. 15, 17, 19). That having been said, during his investigation, Ott never questioned Dunlevy about what he had done nor did he seek any sort of an explanation (Dkt. 23-2, Ott dep., p. 26). When asked why he didn't ask Dunlevy for an explanation Ott testified that it was because he was a "probationary employee" and it wasn't necessary (Dkt. 23-2, Ott dep., p. 26).

Prior to being told of his discharge, Dunlevy had never received any warnings that his performance was in any fashion inadequate (Dkt. 23-1, Dunlevy dep., p. 13).

**E.     Ott and Yakle's Investigation into Murray**

In 2018 Ott learned of concerns about Tour Murray from both Friedmeyer and from Murray's co-workers (Dkt. 23-2, Ott dep., p. 28).  He initially learned that Murray had a criminal felony record (Dkt. 23-2, Ott dep., p. 28) and then a concern was raised that Murray – a convicted felon – had brought a gun to the workplace (Dkt. 23-2, Ott dep., p. 28, 30; Dkt. 23-8, Kuizin dep., p. 56).[4] Ott was greatly

---

[4] Murray has a felony conviction for burglary and he served nearly two months in jail for his offense (Dkt. 24-1, p. 1-7). The fact that he brought a gun into work was discussed with Kuizin and others.  Kuizin recalls having conversations about Murray bringing a gun to the workplace but he isn't entirely clear on the details of those conversations (Dkt. 23-8, Kuizin dep., p. 57-58). He believes it was discussed

concerned about Murray's burglary conviction because meter readers go into the homes of customers (Dkt. 23-2, Ott dep., p. 31).[5]

Once Ott began investigating those concerns, he learned that was not the extent of the concerns about Murray (Ott dep., p. 33). He learned that Murray was not performing his job duties as a water meter reader because he was spending large blocks of time away from work (Ott dep., p. 29). Upon learning of this, Ott forwarded the information that he had learned about Murray to Yakle. Yakle then prepared multiple memos to his supervisors regarding Murray.

Yakle's first memo was dated August 9, 2018 (App. 24-25). In that memo he provided great detail about Murray's criminal conviction. He explained:

> Department staff and I are very concerned with Mr. Murray's access to customer's houses as a UWMR. We don't believe our customers would feel safe knowing such information about the individual entering their house. This information is all available publicly via SJ-R and Sangamon County websites and could be very problematic for COS/CWLP if something ever did happen. (App. 24).

In that memo he also indicated that there were "large gaps in his daily work" that were discovered when doing routine performance checks of all meter readers (App. 25). The memo then proceeded to outline the concerns about the significant number

---

with the City's corporation counsel's office (Dkt. 23-8, Kuizin dep., p. 58).

[5] Murray was not truthful in his application for employment with the City. In his application he denied that he had been convicted of a crime (Dkt. 23-22, p. 4). The job application that Murray completed specifically stated that "false statements on this application shall be considered sufficient cause for dismissal" (Dkt. 23-22, p. 5). Kuizin, the City's Human Resources director, acknowledged that Murray gave untruthful information in his application (Dkt. 23-8, Kuizin dep., p. 49-51).

of hours he was not actually reading water meters (App. 25). The memo concludes by recommending Murray's termination (App. 25).

Two weeks later, on August 23, 2018, Yakle prepared a second memo recommending Murray's termination (App. 21-22). The second memo again addressed both of the concerns the first memo had addressed (App. 21-22). It explained the concerns about a convicted burglar going into customer homes and the concerns about his work (App. 21-22). The difference is that in the second memo Mr. Yakle went into much greater detail as to his habit of not actually working when he was on the clock (App. 21-22). It provided a great deal of detail as to specific instances and explained that management had looked at an additional two weeks' worth of data (App. 22). These records demonstrated that he would start work 1 ½ hours to 2 ½ hours late on a daily basis, that he would take lunch breaks that would go on for at 1 ½ hours to 2 hours and that he had approximately 3 hours of downtime every day (App. 21-22).

Like the first memo, the second also recommended that Murray be terminated from his probationary employment (App. 21-22). Both of these memos recommending that Murray be terminated was signed off on by Friedmeyer, Ott, and Yakle (App 21-25).

Davis had discussed this issue with Yakle before the memo was drafted and agreed that the recommendation in the memo should be to terminate Murray's employment (Dkt. 23-5, Davis dep., p. 21).

15

**F.     Decisions regarding both Dunlevy and Murray**

After receiving the memos, Davis discussed both the Dunlevy and Murray

situations with Brown (Dkt. 23-5, Davis dep., p. 21).[6]  Both agreed that it was best

to cut both loose from their positions (Dkt. 23-5, Davis dep., p. 21). The memoranda

recommending the termination of both Dunlevy and Murray were both forwarded

by the human resources director, Jim Kuizin, to the City's corporation counsel (Dkt.

23-8, Kuizin dep., p. 60). Kuizin testified that it was the recommendation of the

City's corporation counsel that Murray's employment be terminated (Dkt. 23-8,

Kuizin dep., p. 59).

On September 21, 2018, Kuizin wrote that he had received word from

Langfelder's office that they wanted to extend Murray's probationary period and

terminate Dunlevy (Dkt. 23-14; Dkt. 23-8, Kuizin dep., p. 60). Neither Kuizin,

Brown, nor Davis played no role in making the decision to reject the

recommendation that Murray's employment be terminated or that his probation be

extended (Dkt. 23-8, Kuizin dep., p. 60; Dkt. 23-6, Brown dep., p. 7-8; Dkt. 23-5,

Davis dep., p. 53). Indeed, Murray received no discipline whatsoever (Dkt. 23-8,

Kuizin dep., p. 62). On September 24, 2018, an agreement was entered into between

the City and Murray's union that provided he would not be disciplined in any

fashion and that his probation would be extended for an additional six months (Dkt.

23-16).

---

[6]  Brown explained that because of his schedule, it was primarily Davis who was
working on the Dunlevy and Murray issues with Human Resources (Dkt. 23-6,
Davis dep., p. 17).

Langfelder was asked why Dunlevy was terminated during his deposition (Dkt. 23-7, Langfelder dep., p. 17). He testified he could not recall why Dunlevy was terminated (Dkt. 23-7, Langfelder dep., p. 19). When asked if he had read the termination memo on Dunlevy he testified "No, not that I'm aware of" (Dkt. 23-7, Langfelder dep., p. 17, 22). Langfelder could simply remember – after reading through the memorandum recommending the discharge of Dunlevy – that it was because he was a probationary employee and that it was a recurring incident (Dkt. 23-7, Langfelder dep., p. 23). As to Murray, Langfelder said he felt the issue "was a training issue" and thus extending his probation is what was determined (Dkt. 23-7, Langfelder dep., p. 30). Langfelder explained that he understood that the issue with Murray was taking he had taken an extended lunch break of "15 minutes" (Dkt. 23-7, p. 31).

Langfelder signed Dunlevy's termination documentation on the same day that Murray's probation was extended, September 24, 2018 (Dkt. 23-12). Dunlevy was notified of his termination on September 28, 2018 (Dkt. 23-12).

Davis testified that he wondered if Murray's race played a role in him not being removed. He explained that "[j]ust with diversification and, you know, trying to increase minority hiring and, you know, wanting to maintain minority numbers" (Dkt. 23-5, Davis dep., p. 32). Langfelder acknowledged that he was very concerned about minority hiring numbers. His goal was that the diversity numbers of the City reflect the demographic makeup of the City (Dkt. 23-7, Langfelder dep., p. 13). Langfelder has stated that he has always had the goal of increasing minority

employment with the City (Dkt. 23-7, Langfelder dep., p. 16).

## IV. SUMMARY OF ARGUMENT

Andrew Dunlevy and Tour Murray were both hired by the City's public utility to be probationary water meter readers. They were hired within about two weeks of one another, they had an identical supervisory chain, and both were subjected to the same rules and policies. Both were also probationary employees for twelve months which meant that they had no civil service protections in their jobs.

Towards the end of their probationary terms their supervisors became troubled about some concerns that they had about their employment. Investigations were performed into both of them and their supervisory chain all recommended that they be terminated before they could complete their probationary period.

The allegations against the two differed, however, there were no written rules or policies that either was cited as violating. Dunlevy was accused of erroneously entering data into his handheld computer. Murray, it was learned, was a convicted felon who had not disclosed that fact on his application. His felony conviction had been for burglary which caused a great deal of concern for his supervisors because his position required him to go into the homes of CWLP's customers. The concerns with Murray, however, didn't stop there. Murray had a striking pattern of not working when he was supposed to do so. He would be absent from his route for hours at a time. An audit of his time was performed and it showed he would average not working more than three hours of each shift.

Given that both were probationary employees and if they completed their promotion they would have protections in their jobs, their supervisors all believed

that their employment should be terminated. Everyone apparently agreed with this determination except for Langfelder, the City's mayor. Langfelder decided that Murray would receive no discipline and that his probation would be extended instead. Dunlevy, on the other hand, was terminated.

Dunlevy challenges the dismissal on the grounds of race discrimination because he is white and Murray is black. Before the district court Langfelder and the City argued that Dunlevy could not make out a prima facie case of race discrimination because he could not demonstrate that he and Murray were "similarly situated." They didn't address any other prong of the prima facie case and never outlined a justification for their actions.

The district court erroneously agreed that Dunlevy and Murray were not similarly situated. In so doing the district court improperly assessed the subjective – and factually inaccurate -- views of Langfelder. At the prima facie case stage the assessment of whether two employees are similarly situated is an objective assessment.

The district court concluded that no reasonable jury could possibly conclude that Murray and Dunlevy were similarly situated. This conclusion is hard to square with the fact that the entire supervisory chain of both found that they had engaged in misconduct of comparable seriousness that warranted termination.

# V. ARGUMENT

**A.   This Court's review of the district court's order is *de novo* and summary judgment is only appropriate when no jury could reasonably find for the non-moving party.**

This Court reviews a grant of summary judgment *de novo*. *Pyles v. Fahim*, 771 F.3d 403,408 (7th Cir. 2014). Summary judgment is appropriate when the admissible evidence shows that there is no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014). A material fact is one that affects the outcome of the suit. *Id.* Summary judgment is inappropriate when, based on the evidence in the record, a reasonable jury could return a verdict for the non-moving party. *Id.* at 682. In determining whether a genuine issue of material fact exists, the record must be viewed in the light most favorable to the nonmoving party. *Id.* This Court has cautioned that the role of the courts when reviewing summary judgment is not to act as a jury. *Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012). "When ruling on amotion for summary judgment, the party opposing the motion gets the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312, 314 (7th Cir. 2011).

**B.      The sole issue on appeal is whether there was sufficient evidence at the prima facie case stage from which a jury could find that Dunleavy and Murray were similarly situated.**

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), the Supreme Court established the traditional framework to be utilized in evaluating a discrimination claim. A plaintiff who relies upon the *McDonnell Douglas* burden shifting method bears the burden of articulating a prima facie case. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). If a plaintiff establishes a prima facie case, a fairly simple task, the burden then shifts to the employer to articulate a legitimate basis for its decision. The establishment of a prima facie case, in essence, creates a rebuttable presumption of discrimination. *Id.* If the employer successfully can articulate a legitimate explanation for its decision, the burden shifts back to the plaintiff to present evidence from which a jury could conclude that the employer's justification was not truthful. *Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005). As this Court has explained, "*McDonnell Douglas* is designed to give the plaintiff a boost when he has no actual evidence of discrimination but just some suspicious circumstances." *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 643 (7th Cir. 2002).

Dunlevy has brought a claim of disparate punishment because of race. Under the *McDonnell Douglas* indirect method, a plaintiff must first establish a prima facie case by providing evidence "that (1) he is a member of the protected class; (2) he met her employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of the protected

class were treated more favorably." *Naficy v. Illinois Dept. of Human Services*, 697 F.3d 504, 511 (7th Cir. 2012).

In disparate punishment cases, like this one, the second and fourth prongs of the prima facie case merge and are satisfied by a showing that a similarly situated employee outside the plaintiff's protected class committed a similar act but was subjected to less severe discipline. *Elkhatib v. Dunkin Donuts, Inc.,* 493 F.3d 827, 831 (7th Cir. 2007). If the plaintiff makes this showing, the burden shifts to the employer "to introduce a legitimate, nondiscriminatory reason for the employment action." *Naficy,* 697 F.3d at 511. Then, if the employer meets that burden of production, the burden shifts back to the plaintiff to provide evidence that the employer's stated reason was pretextual. *Id.* at 511–12.

Before the district court, the City and Langfelder argued the Dunlevy could not establish a prima facie case of discrimination.  In so doing they argued that Dunlevy and Murray were not "similarly situated" and thus Dunlevy could not establish a prima facie case of discrimination (Dkt. 23, p. 9-12). The City's argument on the *McDonnell Douglas* burden shifting stopped at that point. They made no argument that justified the differential treatment of the two and thus it was not incumbent upon Dunlevy show pretext.

Given that the City and Langfelder limited their argument to this issue before the district court, the question on appeal is limited to whether a jury could reasonably conclude that Dunlevy and Murray were "similarly situated" at the prima facie case stage of the litigation.

Dunlevy, of course, has forwarded three separate legal theories. The *McDonnell Douglas* burden shifting methodology of course was initially used to analyze claims brought under Title VII. This Court has repeatedly noted that claims of discrimination under 42 U.S.C. § 1983 are evaluated the exact same way. *Burks v. Wisconsin Dept. of Transp.,* 464 F.3d 744, 750 (7th Cir. 2006). Claims brought under the Illinois Human Rights Act are also analyzed the same way. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178, 545 N.E.2d 684, 687 (1989).

**C.    Dunlevy does not need to demonstrate that he was a perfect employee in order to be successful in his claim.**

Before turning to Dunlevy's principal argument, it is important to point out that Dunlevy doesn't have to establish that he was a model employee.  Indeed, while Dunlevy has disputed that he engaged in any sort of misconduct while employed by the City, the question is whether he was treated differently than Murray was. As this Court explained in *Luster v. Illinois Dept. of Corr.*, 652 F.3d 726, 730 (7th Cir. 2011):

> Federal employment discrimination laws do not limit their protection to perfect or even good employees. They also protect employees who misbehave or perform poorly. Under Title VII of the Civil Rights Act of 1964, an employer cannot intentionally discipline poor employees more severely on the basis of race, sex, religion, or national origin.

*See also Schandelmeier–Bartels v. Chicago Park Dist.,* 634 F.3d 372, 376 (7th Cir. 2011) ("perfection is not a requirement for protection under Title VII"); *Perez v. Thorntons, Inc.,* 731 F.3d 699, 700 (7th Cir. 2013)("All employees, not only perfect employees, are protected by Title VII.")

**D.    Dunlevy has sufficiently established a prima facie case under *McDonnell Douglas* because a jury could reasonably conclude that he and Murray were "similarly situated."**

Establishing a prima facie case should not be such an onerous requirement: "the plaintiff's evidence on the prima facie case need not be overwhelming or even destined to prevail; rather, the plaintiff need present only 'some evidence from which one can infer that the employer took adverse action against the plaintiff on the basis of a statutorily proscribed criterion.' " *Bellaver v. Quanex Corp.*, 200 F.3d

485, 493 (7th Cir.2000) *(quoting Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 793 (7th Cir.1997) (also noting that the prima facie burdens "should not be applied rigidly")); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous.").

In this case Dunlevy is alleging disparate discipline. He contends that he was treated differently than Murray. More pointedly, he is contending that a reasonable jury could conclude that if he were black he would not have been terminated and is comparing himself to Murray in order to support that proposition.

Before turning to the argument, it is important to point out that the question of whether a plaintiff is similarly situated to a comparable is a question of fact that is ultimately best reserved to the determination of a jury. *Coleman v. Donahoe*, 667 F.3d at 846–47 (reversing summary judgment); *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007); *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). Summary judgment as to this issue is only appropriate where "no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Coleman*, 667 F.3d at 846-47.

The *Coleman* and *Humphries* decisions are likely this Court's two most comprehensive decisions involving the issue of whether an employee is similarly situated. That having been said, there are many others that outline the same analysis. *See e.g. Morris v. BNSF Ry. Co.,* 969 F.3d 753, 761 (7th Cir. 2020); *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dept.,* 510 F.3d 681, 688 (7th

Cir. 2007)("[o]ur similarly situated requirement 'should not be applied mechanically or inflexibly."); *Levy v. Wilkie*, 841 Fed. Appx. 987, 992 (7th Cir. 2021).

*Coleman*, however, provides the most complete analysis and explains how trial courts oftentimes require too much for employees to be considered similarly situated. It explained that the analysis is intended to be flexible and apply common sense in analyzing this prong of the prima facie case. *Id.* at 846. In *Coleman* this Court explained that finding employees in identical situations was not the standard that is to be applied. The Court explained that the employees need to be comparable in material respects, but not identical in "in every conceivable way." The Court highlighted that "[w]e are looking for comparators, not "clone[s]." *Id.*

This Court has outlined three separate factors that should be analyzed: (1) did the employees have the same supervisor; (2) were they subjected to the same standards of conduct; and (3) did they engage in conduct of comparable seriousness. *Id.* at 847-852. As this Court explained in *Coleman*, courts have a tendency to erroneously apply the similarly situated prong of the prima facie case.[7]

The term "comparable seriousness" is not unique to the Coleman decision. It owes its existence to *McDonnell Douglas*. As the Supreme Court has subsequently explained:

> Of course, precise equivalence in culpability between employees is not the ultimate question: as we indicated in *McDonnell Douglas*, an allegation that other "employees involved in acts

---

[7] In a footnote the Court cited to multiple scholarly works that have explained how "demanding nearly identical comparators can transform this evidentiary "boost" (of *McDonnel Douglas*) into an insurmountable hurdle. *Coleman*, 667 F.3d at 852 FN 5 (7th Cir. 2012).

> against (the employer) of Comparable seriousness . . . were
> nevertheless retained . . ." is adequate to plead an inferential
> case that the employer's reliance on his discharged employee's
> misconduct as grounds for terminating him was merely a
> pretext. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273,
> 283, 96 S. Ct. 2574, 2580, 49 L. Ed. 2d 493  FN 11 (1976).

It is hard to imagine two employees more closely intertwined than Murray and Dunlevy.  They were hired within a few days of each other, for the identical job, both were probationary employees, they had the exact same job rules (although there were apparently no written rules), and both had the same exact supervisory chain that they reported to.  At around the same time, the supervisory chain, from Friedmeyer to Ott to Yakle to Davis to Brown (and HR Director Kuizin) all recommended that both be discharged during their probationary terms.  Further, these recommendations were made within days of one another.  It is hard to imagine how any two employees could be more similar.

The district court concluded that "no reasonable jury" could conclude that Dunlevy and Murray were "similarly situated" (App. 16).  This is a curious conclusion given that their entire chain of command and the City's Human Resources Director all thought that they both engaged in conduct that warranted termination. If these City officials all felt that the conduct of both Dunlevy and Murray was serious enough to warrant discharge a jury could certainly find their actions to be of comparable seriousness.

It is unclear exactly what rules Dunlevy allegedly violated as there is no manual that governs the employment of meter readers and the City has never pointed to a specific rule.  The City contends that he was "curbing meters", however,

they have presented no documentation to support that any such rule exists.  Even if

it did, it is essentially negligent conduct. Even if the conduct were intentional

misconduct, that would be no different than what Murray did when he was AWOL

for hours at a time.

The real issue that was presented was explained well by Mr. Ott.  He

testified that when considering when an employee is in a probationary status they

need to demonstrate that they are "are worth keeping." This reflects the reality that

once someone becomes certified terminating them is challenging.  According to the

entire supervisory chain at CWLP, both employees were lacking and neither

deserved to survive their probationary terms.  In this sense, they were both alleged

to have violated the exact standard. As this Court explained in *Perez v. Thorntons,*

*Inc.,* 731 F.3d 699, 705 (7th Cir. 2013), "We believe it should be left to a jury to

decide whether they were similar enough to support an inference of discrimination."

The same applies here.

Things become even more confusing when Mayor Langfelder's testimony is

examined.  He really offers no insight as to why he decided to terminate Dunlevy.

He initially contends that the decision to extend Murray's probation and terminate

Dunlevy was a "mutual" decision between him and CWLP officials (Dkt. 23-7,

Langfelder dep., p. 28-29). This statement seems improbable and is certainly at

odds with the testimony of others.[8]  Brown testified that he never had any

---

[8] Not only is it at odds with the testimony of the others, it is also at odds with the
City's statement of undisputed facts in support of its motion for summary judgment
(Dkt. 23, p. 6, ¶ 26).

conversations with Langfelder about Murray (Dkt. 23-6, Brown dep., p. 16). Similarly, Davis testified that he was not involved in the decision to extend Murray's probation instead of terminating him (Dkt. 23-5, Davis dep., p. 27).

Further, his statements regarding Murray are demonstrably not true. Mayor Langfelder contends that Murray was simply guilty of coming back late, by about fifteen minutes, from a lunch break. If that were the case, he might have a valid point, but that wasn't the case. Murray had been away from work for hours at a time and was clearly not doing what he was supposed to be doing. Langfelder has completely disregarded the memo that was written outlining the basis for Murray's termination.

Murray's problems were objectively more problematic. He was a convicted felon who had been convicted of burglary. While this might not be the type of thing that would automatically render all employees incapable of performing their jobs, in his position Murray would go into customer's homes. This is a significant problem that greatly troubled management at CWLP. This problem only gets larger when it becomes clear that Murray lied about it. Indeed, the only written rule that has been offered into evidence is that applicants can not lie on their employment applications and, if they do, that will be grounds for immediate termination. Murray lied on the application by claiming he had never been convicted of a crime.

Langfelder was concerned – likely with good reason – about minority hiring in Springfield. He candidly testified to that and indicated his goals were to see that there was equal representation of minority employees in city government. He

explained that he would have his Deputy Mayor attend all applicant interviews before they were hired to make sure that there was no discrimination. While this is certainly a valid goal, achieving it by creating different standards that can be applied to different employees is problematic. Davis, who Langfelder contends he discussed this with – believed that Murray's race might have been the decisive factor.

Reviewing the evidence that has been offered a jury would not be compelled to conclude that Murray and Dunlevy are not similarly situated. While it could find that way, that doesn't cut it at the summary judgment stage. A jury could find for Dunlevy and that is sufficient for his case to proceed.

**E.    The district court improperly turned to the pretext stage by evaluating Langfelder's supposed justifications. Given that the City advanced no pretext argument – and given the district court stated it was not making a pretext analysis – this was error.**

The district court indicated that because Dunlevy failed to establish a prima facie case it would not address whether the City had offered a legitimate justification for its actions (App. 17). Despite not analyzing the question of pretext, the district court was persuaded that Dunlevy and Murray were not similarly situated because Langfelder found the two types of misconduct were different (App. 16).[9] This conclusion is problematic because it assesses Langfelder's subjective

---

[9] In their memorandum in support of summary judgment, the City and Langfelder had argued that "there is ample and undisputed testimony that the employer genuinely considered Plaintiff's alleged actions to be materially more serious than those of Murray" (Dkt. 23, p. 12). That statement was the conclusion to its argument that Dunlevy could not establish a prima facie case of discrimination because he and Murray were not similarly situated.

views at the prima facie case stage and not at the pretext stage. In *Coleman*, 667

F.3d at 851 FN4 (7th Cir. 2012), this Court explained that such an analysis – at the

prima facie case stage – was not proper:

> An employer's honest belief about its motives for disciplining a
> Title VII disparate treatment plaintiff is relevant, but at the
> pretext stage, not for the plaintiff's prima facie case. The
> similarly-situated inquiry is about whether employees
> are *objectively* comparable, while the pretext inquiry hinges on
> the employer's *subjective* motivations.

Here, of course, the City and Langfelder never even raised the pretext issue

before the district court (Dkt. 23).

## VI. CONCLUSION

If this case were tried a jury certainly wouldn't have to find in Dunlevy's favor. This, of course, isn't what he needs to establish to get his case to a jury. Rather, the question is whether a jury, based upon the evidence that has been presented, could reasonably find that he had been discriminated against when he is compared with Murray. The evidence is here for a jury to make such a conclusion and the entry of summary judgment as to all of Dunlevy's claims was inappropriate. For that reason, the district court's decision should be reversed and the case should be remanded for a trial.

*Andrew Dunlevy*
FEBRUARY 22, 2022

By: /s/ John A. Baker
        His Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
T:      (217) 522-3445
F:      (217) 522-8234
E:      jab@bbklegal.com

## VII. Circuit Rule 31(e) Certification

The undersigned hereby certifies that I have filed electronically pursuant to Circuit Rule 31(e), all of the appendix items that are available in non-scanned PDF format.

Andrew Dunlevy

By: /s/ John A. Baker
        His Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
T:      (217) 522-3445
F:      (217) 522-8234
E:      jab@bbklegal.com

## VIII. Circuit Rule 30(d) Statement

Pursuant to Circuit Rule 30(d), counsel certifies that all materials required by Circuit Rule 30(a) and (b) are included in the appendix.

Andrew Dunlevy

By: /s/ John A. Baker
        His Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
T:      (217) 522-3445
F:      (217) 522-8234
E:      jab@bbklegal.com

## IX.  COMPLIANCE WITH TYPE LIMITATIONS

This brief is under 10,000 words and is in compliance with Rule 32.

Andrew Dunlevy

By: /s/ John A. Baker
        His Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
T:      (217) 522-3445
F:      (217) 522-8234
E:      jab@bbklegal.com

## X. Certificate of Service

The Plaintiff-Appellant, Andrew Dunlevy, hereby certifies that on February 22, 2022, he initially submitted an electronic copy of his initial brief and required short appendix and that they were delivered to all counsel of record via this Court's ECF system.

Andrew Dunlevy

By: /s/ John A. Baker
        His Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
T:      (217) 522-3445
F:      (217) 522-8234
E:      jab@bbklegal.com

## Table of Contents to Short Appendix

Judgment dated November 3, 2021                                        1

Notice of Appeal dated November 4, 2021                                2

Opinion granting summary judgment dated October 29, 2021              4

Office memo regarding Dunlevy dated August 20, 2018                   19

Office memo regarding Tour Murray dated August 23, 2018              21

Office memo regarding Tour Murray dated August 9, 2018               24

Judgment in a Civil Case (02/11)

# UNITED STATES DISTRICT COURT
### for the
### Central District of Illinois

Andrew Dunlevy,          )
                         )
Plaintiff,               )
                         )
vs.                      )          **Case Number: 19-3093**
                         )
James O. Langfelder, Doug Brown,  )
John Davis and City of Springfield, )
                         )
Defendants.              )

### JUDGMENT IN A CIVIL CASE

☐ **JURY VERDICT.**   This action came before the Court for a trial by jury.   The issues have been tried and the jury has rendered its verdict.

☒ **DECISION BY THE COURT.**   This action came before the Court, and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED that judgment is entered in favor of Defendants James O. Langfelder, City of Springfield, Doug Brown and John Davis.**

Dated: November 3, 2021

_s/ Shig Yasunaga_____
Shig Yasunaga
Clerk, U.S. District Court

Approved:   _s/ Sue E. Myerscough_
            Sue E. Myerscough
            U.S. District Judge

E-FILED
Thursday, 04 November, 2021  01:04:52 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| ANDREW DUNLEVY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.     19-cv-3093 |
| | ) | |
| JAMES O. LANGFELDER, DOUG BROWN, JOHN DAVIS, and CITY OF SPRINGFIELD, | ) ) | |
| | ) | |
| Defendants. | ) | |

# Notice of Appeal

The Plaintiff, Andrew Dunlevy, hereby appeals to the United States Court of Appeals for the Seventh Judicial Circuit from a final judgment that was entered by the District Court on November 3, 2021 (Doc. 28). That judgment stems from this Court entering summary judgment on behalf of the Defendants, James O. Langfelder, Doug Brown, John Davis, and City of Springfield, in an order dated October 29, 2021 (Doc. 27).

Andrew Dunlevy

By: /s/ John A. Baker
His Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:         (217) 522-3445
Facsimile:         (217) 522-8234
Email:             jab@bbklegal.com

1

**APPENDIX 002**

## Certificate of Service

This document was filed utilizing the Court's ECF system. A copy will automatically be sent to all counsel of record. No copies have been served utilizing any other method of service.

Andrew Dunlevy


By: /s/ John A. Baker
    His Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:        (217) 522-3445
Facsimile:        (217) 522-8234
Email:            jab@bbklegal.com

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **ANDREW DUNLEVY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 19-cv-3093** |
| | ) | |
| **JAMES O. LANGFELDER,** | ) | |
| **DOUG BROWN, JOHN DAVIS,** | ) | |
| **and CITY OF SPRINGFIELD,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

This cause is before the Court on the Motion for Summary Judgment (d/e 23) filed by Defendants James O. Langfelder, Doug Brown, John Davis, and the City of Springfield. For the reasons that follow, the Motion is GRANTED.

## I. INTRODUCTION

On May 20, 2019, Plaintiff Andrew Dunlevy filed a three-count Amended Complaint (d/e 11) against Mayor James O. Langfelder and two City Water Light and Power ("CWLP") employees, Doug Brown and John Davis, and the City of Springfield. Count I alleges that Mayor Langfelder, Brown, and Davis violated Dunlevy's equal

protection rights under the Fourteenth Amendment by terminating Dunlevy based on his race.  Dunlevy is white.  Count II alleges that the City of Springfield violated Dunlevy's rights under the Illinois Human Rights Act, 775 ILCS 5/1-101, *et seq.*  Count III alleges that the City of Springfield discriminated against Dunlevy on the basis of his race when Dunlevy was terminated from his employment in violation of Title VII of the Civil Rights Act.

On October 31, 2020, Defendants filed a motion for summary judgment arguing that no other employee was similarly situated to Dunlevy and, therefore, Dunlevy's rights were not violated. Motion, d/e 23.  Dunlevy filed a response, to which Defendants filed a reply. Response, d/e 24; Reply, d/e 25.

## II. FACTS

The Court draws the following facts from the parties' statements of undisputed facts and from the evidence submitted by the parties.  Any facts not disputed or disputed without evidentiary documentation of the basis for the dispute have been deemed admitted.  See CDIL-LR 7.1(D)(2)(b)(2).

Dunlevy, a white individual, was employed at CWLP, which is a public utility owned by the City of Springfield.  Defendant's

Statement of Facts, d/e 23, p. 3; Plaintiff's Additional Statement of Facts, d/e 24, p. 12.  Dunlevy was employed as a meter reader.  D/e 24, p. 12.  His supervisor was John Friedmeyer, the maintenance supervisor. D/e 23, p. 4.   Friedmeyer was supervised by Don Ott, the superintendent of distribution and general services.  Id.  Ott was supervised by Greg Yakle, the director of transmission and distribution.  Id.  Yakle was supervised by John Davis, the electric division manager.  Id.  Davis was supervised by Doug Brown, the chief utility engineer, and Brown reported to the Mayor of Springfield, James Langfelder.  Id.  Mayor Langfelder is the appointing authority for the City of Springfield so he has the final authority for the hiring and firing of the employees at CWLP.  D/e 23-7, pp. 16-17.  As of September 2020, CWLP had 531 employees and the City had a total of 1,450 employees.  D/e 23, p. 7.

On September 18, 2017, Mayor Langfelder extended a job offer to Tour Murray as a meter reader, and his first day of employment was September 25, 2017.  D/e 24, p. 12-13.  Murray is African American. D/e 23, p. 5.  On September 25, 2017, Mayor Langfelder extended a job offer to Dunlevy, and his first day of employment was October 23, 2017.  D/e 24, p. 13.  Both individuals were

notified that the position was subject to a 12-month probationary term. D/e 23, pp. 3, 5.

Ott directed an investigation of several utility accounts on Dunlevy's reading route.  D/e 23, p. 4.  Based on that investigation, Ott authored a memorandum dated August 20, 2018 that recommended Dunlevy's discharge during the course of Dunlevy's probationary period.  D/e 24, p. 14.  The memorandum alleged that Dunlevy entered inaccurate readings on several addresses on his route.  D/e 23, p. 4.  Ott concluded that Dunlevy was falsifying his meter reads and not conducting actual reads of the meters.  D/e 23-9, p. 1; d/e 23, p. 4.  Ott concluded in his memorandum:

> Mr. Dunlevy is a probationary employee, and this behavior is only going to get worse with more time.  These are accounts I could find, I'm sure there are countless examples that have gone unnoticed.  In the case of Maggie [D]rive[,] the customer felt he was ok watering his yard due to the actual reads by Dunlevy.  Now this customer is required to pay CWLP for $500.00 of water usage in a single bill.  Based on the above[,] I recommend releasing Mr. Dunlevy from employment.

D/e 23-9, p. 2.

After reviewing and discussing the memorandum, Ott, Friedmeyer and/or Yakle, Human Resources Director Jim Kuizin, Davis, and Brown agreed to recommend to Mayor Langfelder the

termination of Dunlevy.  D/e 23, p. 5.  The Human Resources
Department prepared termination paperwork, which was submitted
along with the memorandum to the Mayor's office for a final
decision.  Id.  Defendants contend that Mayor Langfelder read the
memorandum, which Dunlevy disputes.  Mayor Langfelder testified
that he is not aware that he reviewed the memorandum.  D/e 23-7,
p. 17.  Mayor Langfelder also testified that he does not recall any
details as to why Dunlevy was terminated, but Mayor Langfelder
acknowledged that he is responsible for all hiring and firing.  Id. at
16-17.  Dunlevy was terminated by Mayor Langfelder.  D/e 23, p. 5.

Dunlevy did not receive any warnings that his performance
was inadequate prior to notification of his termination. D/e 24, p.
15.  Ott did not question Dunlevy or seek an explanation from
Dunlevy.  D/e 24, p. 15.  Dunlevy disputed that he was curbing
meters[1].  D/e 24, p. 15.  Dunlevy's termination was signed off by
superiors on August 20, 2018.  D/e 24, p. 15. Mayor Langfelder

---

[1] Falsifying meter reads without conducting actual reads is referred to as
"curbing meters," which describes the practice of entering meter "readings"
without reading the meter.  D/e 23, p. 5.

signed off on Dunlevy's termination on September 24, 2018.  D/e 24, p. 19.

In 2018, Ott learned of concerns regarding Murray so Ott conducted an investigation into the allegations.  D/e 24, p. 15. Ott learned that Murray was a convicted felon.  Id. at 16.  Additionally, Murray was deviating from his route and taking breaks longer than acceptable.  D/e 25, p. 2; d/e 23-2, pp. 29-30.  Ott was also told that Murray brought a gun to the workplace, but such claim was unsubstantiated and was not reported to Mayor Langfelder.  D/e 24, p. 15; d/e 25, p. 3.  Murray also denied on his employment application that he was convicted of a crime.  D/e 24, p/ 16. Defendants dispute that Murray materially lied on his employment application, stating that the form in question is not used for criminal background checks and the background check only goes back 7 years.  D/e 25, p. 3.  Major Langfelder was never informed of Murray bringing a gun to work.  D/e 25, p. 3.  On August 23, 2018, a memorandum written by Greg Yakle to John Davis stated two reasons recommending Murray be terminated: (1) "In August of 2010[,] Mr. Murray was charged with Residential Burglary, Theft, and Criminal Damage to Property.  Ultimately[,] Mr. Murray pleaded

guilty to Burglary in that case" and (2) "supervision has found incidents where there have been large gaps in [Murray's] daily work."  D/e 23-10, pp. 1-2.  The memorandum did not say that Murray lied on his employment application.  Id.  Yakle recommended releasing Murray from employment while Murray was still a probationary employee.  Id.  Mayor Langfelder decided to extend Murray's probationary period instead of termination.  D/e 23, p. 6.

Mayor Langfelder was concerned about minority hiring numbers and had a goal of increasing minority employment at the City.  D/e 24, p. 18.  The City maintains an affirmative action plan intended to promote a diverse workforce.  Id.

Mayor Langfelder testified that he considered falsifying meter readings more serious than "goofing off" while working.  D/e 23-7, p. 62.  He also testified that the conduct described in the memorandum relating to Murray, specifically the "lack of diligence on the job while on the clock," is not a dischargeable offense on first notice.  Id. at 33-34.  Mayor Langfelder believed Murray's job performance could be corrected with training.  Id. at 30.  Moreover, Mayor Langfelder testified that Murray's job performance was not

affected by Murray's burglary conviction.  <u>Id.</u> at 34.  The complaint from Yakle was that Mayor Langfelder and others did not know about the conviction until after hiring.  <u>Id.</u>  Mayor Langfelder testified that lying on a hiring application is a terminable offense. <u>Id.</u> at 28.

Mayor Langfelder did not recall ever meeting Dunlevy or Murray.  D/e 23, p. 6. Dunlevy testified in his deposition that he is not aware of direct evidence of race playing a part in his termination or the decision not to terminate Murray.  <u>Id.</u>

### III. LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of any genuine dispute of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the nonmoving party.  <u>Carroll v. Lynch</u>, 698 F.3d 561, 564 (7th Cir. 2012).  When ruling on a motion for

Appendix 011

summary judgment, the Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  Woodruff v. Mason, 542 F.3d 545, 550 (7th Cir. 2008).

## IV. ANALYSIS

### A. Defendants Brown and Davis Are Entitled to Summary Judgment.

Dunlevy agrees that Defendants Doug Brown and John Davis did not discriminate against Dunlevy and that Defendants Brown and Davis are not proper defendants.  D/e 24, p. 23.  Because Dunlevy admits that Defendants Brown and Davis did not discriminate against Dunlevy, Defendants Brown and Davis are entitled to summary judgment.

### B.  Defendants Mayor Langfelder and the City of Springfield Are Entitled to Summary Judgment Because Murray Was Not Similarly Situated to Dunlevy.

Dunlevy alleges three separate claims, but all three claims are analyzed the same.  See Barnes v. Bd. of Trustees of Univ. of Illinois, 946 F.3d 384, 389 (7th Cir. 2020) ("The legal standard for analyzing racial discrimination claims under Title VII and § 1983 is the same.").

In evaluating a summary judgment motion on an employment discrimination claim, one "common, but not exclusive" approach used by plaintiffs to establish a "triable issue of intentional discrimination" is the burden-shifting approach created by the Supreme Court in McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973). David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508, 846 F.3d 216, 224 (7th Cir. 2017) (quoting Volling v. Kurtz Paramedic Servs., Inc., 840 F.3d 378, 383 (7th Cir. 2016)). A plaintiff who relies on the McDonnell Douglas framework must first establish a prima facie case of discrimination, at which point the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment decision, at which point the plaintiff must prove that the stated reason is a pretext. Purtue v. Wisconsin Dep't of Corr., 963 F.3d 598, 601–02 (7th Cir. 2020). The Illinois Supreme Court adopted the McDonnell Douglas framework when handling an Illinois Human Rights Act claim. See Zaderaka v. Illinois Human Rights Com., 131 Ill.2d 172, 178 (1989). All parties agree that the McDonnell Douglas framework is the proper standard to use in this case.

Appendix 013

Here, Dunlevy is alleging disparate discipline when Mayor Langfelder terminated Dunlevy but not Murray.  More specifically, Dunlevy argues that, if he were an African American individual, Dunlevy would not have been terminated.  Dunlevy alleges that he is a member of a protected class, he met his employer's job expectations, he suffered an adverse employment action – being terminated, and a similarly situated employee outside of the protected class – Murray – was treated more favorably.  Defendants argue that Dunlevy and Murray were not similarly situated, and, therefore, Dunlevy's prima facie case fails.

Two people are similarly situated when the individuals "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  Gates v. Caterpillar, Inc., 513 F.3d 680, 690 (7th Cir. 2008) (internal quotations omitted).  "Similarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way."  Coleman v. Donahoe, 667 F.3d 835, 846 (7th Cir. 2012).  "We are looking for comparators, not "clone[s]."  Id. (quoting

Chaney v. Plainfield Healthcare Center, 612 F.3d 908, 916 (7th Cir.2010)).

The question of whether individuals are similarly situated is typically a question of fact.  Coleman, 667 F.3d at 846.  "[S]ummary judgment is appropriate only when no reasonable fact-finder could find that plaintiffs have met their burden on the issue."  Id. at 846-47.  "There must be "enough common factors to allow for a meaningful comparison in order to divine whether intentional discrimination was at play."  Id. at 847.

Here, Dunlevy and Murray had the same supervisor and were held to the same employment standards.  At issue is whether they engaged in "similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  Gates, 513 F.3d at 690.

Dunlevy argues that his conduct was the same or less serious than the conduct of Murray.  To Dunlevy, curbing meters is like lying and Murray lied about his prior conviction.  Mayor Langfelder testified that Murray's burglary conviction was an issue prior to his employment and one that did not affect his currently job performance.  Dunlevy's main job responsibility was reading meters

and recording that information, which was used to charge CWLP customers.  After an investigation, Ott found that Dunlevy was falsifying meter reads and not conducting actual reads of the meters.  On one occasion, Dunlevy's false meter reading resulted in an additional charge to a customer of $500 after the reading was corrected.  Dunlevy's false readings directly affected CWLP's income and the cost to CWLP's customers.  As for Murray, Murray lied about an event that occurred prior to his employment, which was not related to the actual performance of his job.

Dunlevy also argues that Murray was gone for hours at a time at work.  Mayor Langfelder testified that he considered Dunlevy's conduct more serious than Murray's goofing off and determined that Murray's conduct could be corrected by training.  In Mayor Langfelder's opinion, Murray's lack of diligence on the job while on the clock is not a dischargeable offense on first notice.  However, Dunlevy's conduct of falsifying meter readings warrants discharge regardless of an employee's probationary status.

The Court finds that Dunlevy and Murray were not similarly situated employees.  The conduct of the two are not comparable in seriousness, and no reasonable jury could find otherwise.  Dunlevy

was falsifying the meter reads, which was his main job responsibility, that had monetary consequences to both CWLP and its customers. On the other hand, Murray lied about a previous conviction and was slacking on the job. Murray's conduct is materially different.

In Coleman, the Seventh Circuit held that the plaintiff and two co-workers violated the same rule that prohibits violent and/or threatening behavior when the two individuals threated another employee with a knife and the plaintiff made an indirect threat to a different co-worker. Coleman, 667 F.3d at 851. In Humphries v. CBOCS West, Inc., 474 F.3d 387 (7th Cir. 2007), the plaintiff and the comparator both left the safe unlocked, which was the basis for the plaintiff being fired. 474 F.3d at 406. Even though written policies are not at issue, the conduct of Dunlevy and Murray are not of the same quality as was found in Coleman and Humphries.

Because Dunlevy cannot establish a prima facie case, the burden does not shift to Defendants to articulate a legitimate explanation for their actions. Therefore, the Court does not address whether Defendants have offered a legitimate explanation for Dunlevy's termination.

## VI. CONCLUSION

For the reasons stated above, Defendants Mayor Langfelder and the City of Springfield are entitled to summary judgment.  The Court hereby GRANTS defendants' motion for Summary Judgment (d/e 23).

**IT IS THEREFORE ORDERED THAT:**

1.    Defendants' Motion for Summary Judgment (d/e 23) is GRANTED.

2.    The Clerk is DIRECTED to enter final judgment in favor of Defendants James O. Langfelder, Doug Brown, John Davis, and the City of Springfield.

3.    Any pending motions are DENIED as MOOT, any pending deadlines are TERMINATED, and any scheduled settings are VACATED.  This case is CLOSED.

**ENTERED:  October 28, 2021**
**FOR THE COURT:**

*s/ Sue E. Myerscough*
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**

# Office Memorandum

**TO:**       **John Davis**

**FROM:**     **Don Ott**

**DATE:**     **August 20, 2018**

**SUBJECT:**  **Dunlevy Memo to Record**

Digitally signed by Don Ott Date: 2018.08.22 14:03:09 -05'00'

John G Friedmeyer Digitally signed by John G Friedmeyer Date: 2018.08.22 14:00:41 -05'00'

---

Electric Distribution and General Services

---

Due to a complaint from a customer to the commercial office I reviewed that account and found that Mr. Dunlevy had been keying in false readings. Based on this I had a report run to see if I could ascertain if more accounts had been falsified. The following is a summary of what I found.

The original complaint came from 228 Maggie drive. The customer received a water bill for 189 units at $531. Dunlevy was the reader of record for this account. Records show all the reads turned in by Mr. Dunlevy were actual reads. Due to water consumption at the pit meter being less than the sewer meter (downstream of the pit meter) an investigator was sent to get a reading. The investigator found it to be 189 units higher then what was recorded. In addition the Water department was sent to verify his reading and found the same information. Finally, the meter was tested and found to be 100% accurate. The meter reader's equipment has parameters built into them that alert the reader when a reading is keyed in that is outside of the norm. Mr. Dunlevy was keying in reads that met the norm, therefore there were no alarms. What Mr. Dunlevy didn't know was that the customer had begun watering their yard back in April. His last actual reading, gave the customer consumption at the pit meter of 2 units, the sewer meter (that is down stream of the pit meter) had a consumption of 5. This wasn't the first time this happened on this account. In May the pit meter read 3 units and the sewer meter read 8 units.

16 Garnet Court, a vacant house, Mr. Dunlevy charged them with 2 units of water by entering a reading of 1401, when the previous reading was 1399. The customer called in to the commercial office to state the house was empty. An investigator was sent and verified that the meter read 1399 and that no water had been used. It can be possible to fat finger a reading, however given the difference in numbers that is not possible.

363 Fitzgerald, this is an account which has a history of large water consumption in the summer. This account came up on a search of all accounts where the pit meter was less than the sewer meter. Customer used 53 units in June and Dunlevy input a reading which had them using just 5 units in July. I had the meter read on August 9, 20 days of the next billing cycle, and they were up to 38 units.

620 Poinsettia, Mr. Dunlevy keyed in the water reads for April and May, less than the sewer meter, once by 5 units the other by 3 units, respectfully. In June Mr. Dunlevy got an actual read, and the customer was billed for 20 units due to the false readings the previous two months.

2717 Sangamon, Mr. Dunlevy keyed in a reading that billed the customer 4 units. This is a business that consistently waters their lawn in the summer. The previous month actual reading resulted in 36 units being billed. The result is that the customer will now get billed for 99 units to get current with the actual reading of the pit meter.

4830 Key West, Mr. Dunlevy was keying in erroneous reads on the sewer meter. It was determined when he got an actual read and the sewer meter had used 6 units more than the pit meter.

5212 Crane, Mr. Dunlevy again keyed in incorrect sewer reads. Looking at the History you can see where he got actual reads that got the readings up to date.

EXHIBIT
1

Mr. Dunlevy is a probationary employee, and this behavior is only going to get worse with more time.   These are accounts I could find, I'm sure there are countless examples that have gone unnoticed.  In the case of Maggie drive the customer felt he was ok watering his yard due to the actual reads by Dunlevy.  Now this customer is required to pay CWLP for $500.00 of water usage in a single bill.   Based on the above I recommend releasing Mr. Dunlevy from employment.


Cc:    Doug Brown
       John Davis
       Greg Yakle
       John Friedmeyer

# Office Memorandum

**TO:**      **John Davis**

**FROM:**    **Greg Yakle**

**DATE:**    **August 23, 2018**

**SUBJECT:** **Tour Murray**

Digitally signed by Greg Yakle
DN: dnc Greg Yakle, o=City of Springfield, ou=City Water Light and Power, email=Greg.Yakle@cwlp.com, c=US
Date: 2018.08.23 11:13:21 -05:00'

Digitally signed by Don Ott
Date: 2018.08.23 13:36:49 -05'00'

John G Friedmeyer
Digitally signed by John G Friedmeyer
Date: 2018.08.23 11:49:23 -05'00'

Electric Distribution and General Services

I have recently become of aware of some issues and concerns with Tour Murray. Mr. Murray was hired on as a Utility Water Meter Reader, UWMR, on September 25, 2017, and is a probationary employee. As part of his duties as a UWMR he reads water meters. Many of these water meters are in customers basements. To access these meters UWMR's will knock on customers' door and request entry to read the meter. It has come to my attention, that in August of 2010 Mr. Murray was charged with Residential Burglary, Theft, and Criminal Damage to Property. Ultimately Mr. Murray pleaded guilty to Burglary in that case.

In addition to concerns regarding Mr. Murray's background, supervision has found incidents where there have been large gaps in his daily work. These were found during routine performance checks of all readers, for August 2nd and 3rd.

Mr. Murray's work day is from 7am until 3:30 pm with a 30 minute lunch and two 15 minute breaks. There are daily morning briefings that typically take about 15 minutes. There is no reason Mr. Murray should not be able to begin his routes by 8:00am.

August 2, Mr. Murray's route was the Glen Aire subdivision at Taylor and Stevenson. He began his route at 8:10. He had two gaps of 13 minutes before leaving his route at 9:30am. He went by 2234 E Hazel Dell for roughly 15 minutes before returning to his route and began reading at 10:25am. At 11:30am he went to Dirksen and Stevenson returning to his route and began reading at 12:17pm. He finished this route at 1:53pm. Between 12:17pm and 1:53pm he had another 30 minute gap. His next route is in the Trevi Gardens area on south 2nd street. He went there, as you would expect, going west on Stevenson drive to 6th and headed south but he turned and went back to the Hazel Dell address he had stopped by that morning, for approximately 15 minutes. He arrived and read two meters at 2:38pm. These are the last reads he did for the day. Not counting the hour and ten minutes to get to his first read or having finished at 2:38pm, he had 3 hours and 30 minutes of downtime. Typical water meter readers would have a downtime of eighty to ninety minutes during the same interval.

August 3, Mr. Murray read one route that encompassed Trevi Gardens on South 2nd. He didn't begin his route until 9:00am. The AVL shows that he arrived there at 7:39am but after 20 minutes he left. He proceeded south to Toronto road, got on the interstate and stopped at Stevenson and Taylor. He left there and went back to Trevi Gardens arriving at 8:30am but did not begin reading until 9:00am. Murray left his route again at 10:40am and went to



EXHIBIT
2

Octavius Via for 15 minutes, then proceeded to get on the interstate going west and stopped at SW Plaza by Veterans for another 10 minutes. He left there and went to the area by Quik n EZ on Toronto road for another 34 minutes. By the time he arrived back at his route and began reading, 113 minutes had elapsed. While on his route, Murray had 2 more gaps totaling another 44 minutes. He read his last meter at 2:10pm. He left his route and stopped at Stevenson and 6th, where he sat for 27 minutes. He then proceeded to drive to Chatham and Lawrence and was there for a brief time before turning and heading to Groth. He arrived at Groth, 3:00pm. Murray had 2 hours and 36 minutes of downtime, again not counting the fact that he started his route at 9:00am, or finishing at 2:10pm.

As a result of the above management looked at an addition two weeks of information. Mr. Murray had occasions where he did not begin his work until 8:30am and once as late as 9:40am. He would then quit his routes sometimes as early as 1:40pm and many times shortly after 2:00pm. This was in addition to lunch breaks that would last as long as 90 minutes and up to 2 hours. On most days, Mr. Murray's downtime is near 3 hours, again this does not include the time prior to his first read and after his last read.

We also found that there were large gaps between routes. Meter readers are required to take work for the entire day. If they complete one route they are to proceed to the next. Mr. Murry often takes an hour or more, before he begins his next route.

Based on this recent information, we would like to recommend releasing Mr. Murray from employment while he is still a probationary employee.

Cc:    John Friedmeyer
       Don Ott

E-FILED
Saturday, 31 October, 2020  03:45:11 PM
Clerk, U.S. District Court, ILCD

| | |
|---|---|
| **From:** | John.Davis@cwlp.com |
| **Sent:** | Thursday, August 9, 2018 4:06 PM |
| **To:** | Jim.Kuizin@springfield.il.us |
| **Cc:** | Doug.Brown@cwlp.com |
| **Subject:** | FW: Murray 08 09 2018 Confidential.docx |
| **Attachments:** | Murray 08 09 2018 Confidential.docx |

Jim-if you have time Friday I would like to discuss this issue with you.

**From:** Yakle, Greg
**Sent:** Thursday, August 9, 2018 3:32 PM
**To:** Davis, John
**Subject:** Murray 08 09 2018 Confidential.docx

FYI.

1



EXHIBIT

13

APPENDIX 063

# Office Memorandum

Digitally signed by Greg Yakle
DN: cn=Greg Yakle, o=City of
Springfield, ou=City Water Light
and Power,
email=Greg.Yakle@cwlp.com, c=US
Date: 2018.08.22 14:44:02 -05'00'

Digitally signed by Don Ott
Date: 2018.08.22
14:03:39 -05'00'

John G
Friedmeyer
Digitally signed by
John G Friedmeyer
Date: 2018.08.22
14:01:06 -05'00'

**TO:**     **John Davis**

**FROM:**   **Greg Yakle**

**DATE:**   **August 9, 2018**

**SUBJECT:**   **Tour Murray**

**Electric Distribution and General Services**

I have recently become of aware of some issues and concerns with Tour Murray. Mr. Murray was hired on as a Utility Water Meter Reader, UWMR, on September 25, 2017, and is a probationary employee. As part of his duties as a UWMR he reads water meters. Many of these water meters are in customers basements. To access these meters UWMR's will knock on customers' door and request entry to read the meter. It has come to my attention, that in August of 2010 Mr. Murray was charged with Residential Burglary, Theft, and Criminal Damage to Property. The following is an excerpt from case 2010-CF-000636.

09/09/2010 | Notice of Public Defender Assignment Filed by Public Defender: OTWELL

Preliminary Hearing Pleadings Filed by Assistant State's Attorney: KASSEM

Motion for Disclosure to Prosecution Filed by

Pre-Trial Discovery Filed by

Certificate of Compliance Filed by

Information Filed by

COUNT I- RESIDENTIAL BURGLARY

COUNT II- THEFT

COUNT III- CRIMINAL DAMAGE TO PROPERTY

Pre-Trial Discovery Order Signed Judge: GRAVES

Prelim Hearing Waived - Defendant in Custody Judge: KELLEY

DEFENDANT TOUR M. MURRAY: Present the State by ASA JAMIELA KASSEM. Present the Defendant, in person, in the custody of the Sheriff, and by Attorney JOSEPH S. MILLER. Cause called for preliminary hearing. Defendant waives preliminary hearing. Information filed and Defendant enters plea of not guilty. Pretrial Discovery Order entered. THE DEFENDANTS MOTION FOR BOND REDUCTION IS ARGUED AND DENIED. Cause set for jury trial on 10/18/2010 at 09:00 AM before Judge PATRICK KELLEY. CASE ASSIGNED TO JUDGE PATRICK KELLEY. Defendant advised of trial in absentia and remanded to the custody of the Sheriff. CLERK DIRECTED TO SEND A COPY OF THIS DOCKET ENTRY TO JUDGE PATRICK KELLEY.

Ultimately Mr. Murray pleaded guilty to Burglary in that case, please see excerpt.

10/18/2010 | Order of Conditions Signed Judge: KELLEY

Negotiated Plea-Sentencing

DEFENDANT TOUR M. MURRAY : Present the State by ASA JAMIELA KASSEM. Present the Defendant, in person, in the custody of the Sheriff, and by Attorney Miller. Cause called for hearing on Defendant's motion to withdraw plea of not guilty to Amended Count I, Burglary, a Class 2 Felony. Defendant advised of rights and possible penalties and knowingly waives same. Plea of guilty accepted. Judgment entered on plea. Pursuant to negotiations, the Defendant is hereby sentenced to 2 years probation. Defendant to pay a $50 monthly probation fee unless otherwise determined by probation. Defendant to serve 53 days jail with credit for time served. See Written Order. Counts II and III dismissed pursuant to plea. Defendant advised of appeal rights and remanded to the custody of the Sheriff. CAUSE STRICKEN.

Department staff and I are very concerned with Mr. Murray's access to customer's houses as a UWMR. We don't believe our customers would feel safe knowing such information about the individual entering their house. This information is all available publicly via SJ-R and Sangamon County websites, and could be very problematic for COS/CWLP if something ever did happen.

In addition to concerns regarding Mr. Murray's background, supervision has found incidents where there have been large gaps in his daily work.  These were found during routine performance checks of all readers.  This prompted a larger examination, 2 week sampling, and the following was found.

Mr. Murray's work day is from 7am until 3:30 pm with a 30 minute lunch and two fifteen minute breaks.  There are daily morning briefings that typically take about 15 minutes.  He should then be able to begin his routes no later than 8am.
During the 2 weeks, Mr. Murray occasionally, did not begin his work until 8:30 and even as late as 9:40am.   He would then quit his routes sometimes as early as 1:40 and many times shortly after 2.  This was in addition to lunch breaks that would last as long as 90 minutes and up to 2 hours.  On most days, Mr. Murray's downtime is near 3 hours.  This does not include his start and stop times.

We also found that there were large gaps between routes.  Meter readers are required to take work for the entire day.  If they complete one route they are to proceed to the next route.  Mr. Murry often takes an hour or more, before he begins his next route.

Based on this recent information, we would like to recommend releasing Mr. Murray from employment while he is still a probationary employee.